## SOUTHERN RAILWAY COMPANY *v.* HOBBS.

1. Relatively to a female passenger on a railway train, who is partially blind, and who informs the conductor of her infirmity and requests him to assist her in alighting from the train when it reaches her destination, which he promises to do, it is at least the duty of the carrier to stop the train at its station a sufficient length of time to enable her, without undue haste, to leave the train in safety ; and if the conductor, despite his promise, signals the train ahead before the passenger has had a reasonable opportunity to reach the platform of the car, and she is in consequence carried beyond the station and then put off at a point some distance therefrom, the carrier is liable to respond for all damages directly attributable to the tortious conduct of its conductor.

(a) Such a promise, fairly construed, does not amount to an undertaking on the part of the conductor to enter the car in which the passenger is riding, assume charge of her bundles, and escort her from her seat down the aisle

and out upon the platform, unless the passenger is so helpless as to require this extraordinary attention and the conductor has notice that such is the case.

(b) In the absence of appropriate pleadings, the passenger can not, on the trial of an action against the carrier for being carried beyond her destination, rely on and make proof of a custom on the part of its conductors to lend especial assistance to lady passengers when traveling unattended. In no event would proof of such a custom be relevant, unless it were shown that the governing officials of the carrier had knowledge of the custom and recognized it as one the observance of which ladies traveling without escort had a right to expect and demand as matter of right.

2. While it is the duty of a railway company to duly announce to passengers the approach of its trains to regular stations, in order that they may be prepared to promptly alight at their respective points of destination, yet a failure to comply with this duty can not count against the company relatively to a passenger who is in no way misled thereby.

3. In view of the facts brought to light on the trial of the present case, it was erroneous to charge the jury upon the theory that the evidence warranted a finding that there were aggravating circumstances attending the tort alleged to have been committed upon the plaintiff by the defendant company.

Argued May 11, — Decided June 3, 1903.

Action for damages.    Before Judge Janes.    Haralson superior court.    October 15, 1902.

*Hugh M. Dorsey*, for plaintiff in error.
*James Beall* and *Edwards & Ault*, contra.

SIMMONS, C. J.    An action for damages was brought by Mrs. Susie Hobbs against the Southern Railway Company, the plaintiff relying for a recovery upon the following allegations of fact: On December 22, 1900, about 10 o'clock p. m., she took passage from Birmingham, Ala., to Bremen, Ga., over the company's line of railway.    Soon after its train left Birmingham, the conductor in charge thereof came to her and took up her ticket, "and petitioner then and there got said conductor to agree to assist petitioner in alighting from the train at Bremen, and to assist her to the depot," she informing him that "she was traveling alone and had more baggage than she could manage, and, besides, she was partially blind, wherefore it would be almost impossible to travel unassisted." The conductor "assured her that he would see her off the train all right."    When the train reached Tallapoosa, Ga., she repeated her request for assistance, and he "reassured her that he would take care of her, and requested that petitioner be not alarmed."    The conductor "did not enter the car that she was in after the train

left Waco, three miles west of Bremen," and neither he nor any "other person called out Bremen station, as the law requires, nor in no way informed petitioner that the train had arrived at Bremen." He "entirely ignored his promises and his duties to assist . . petitioner from said train after the same stopped at Bremen and [she] was forced to attempt to get off said train unassisted; and . . just as she was attempting to get off of said train, the said conductor waved the engineer ahead and the train moved off and carried . . petitioner about one fourth of a mile east of the depot before stopping." When the train was again stopped, she "appealed to said conductor to carry her back to the depot, telling him that it was his duty to back said train to the depot and let her get off; . . that she was afraid to undertake to go alone, and that she could not conveniently carry her baggage; that it was heavy and unhandy, and that she was almost blind and could not find her way through such black darkness." The conductor, however, "entirely ignored each and all of her appeals, and told petitioner that he could not back his train and that he must go, and did go and leave [her], at two o'clock Saturday morning, fully one quarter of a mile east of the depot, in the cold rain, unprotected or unassisted, to grope her way alone in the dark and through the cold rain." Petitioner "suffered untold miseries and pains, through fear and exposure, on account of" being thus put off the train "at a place where she could get no help or assistance, there being no house near her and she being in a strange place, in a strange country, a female, alone and almost helpless, all of [which] defendant's agents and servants knew." She was forced to get off the train at "a rough, rocky place," and between that point and the depot the company's track passed over a high embankment. It was necessary that she should "travel on the railroad to find her way at all and to keep from falling down said embankment;" the company's right-of-way was very rough, having on it rocks and ballast; "the night was so dark that she was forced to feel her way along, and . . she was expecting every minute to be attacked by tramps." Moreover, "she contracted a severe attack of la grippe on account of being exposed in the cold and rain, . . which has caused her great pain and suffering, besides rendering her unable to perform scarcely any work."

The defendant company interposed a demurrer to the plaintiff's

petition, and also filed an answer in which denial was made of all her allegations of misconduct and negligence on the part of its servants, and in which the defense was set up that "it stopped its train at the station of Bremen for sufficient length of time for the plaintiff to have gotten off; . . that it called the station of Bremen in the car and within the hearing of the plaintiff," and if she did not get off at that station, "her failure to do so was her own fault and negligence," etc. The trial judge overruled the company's demurrer, and the jury returned against it a verdict for $600. It is now before this court, complaining of the overruling of its demurrer, and of the refusal of the court below to grant it a new trial.

1. One of the grounds upon which the demurrer was based was that the promise of assistance which the plaintiff alleged had been made to her by the conductor amounted to no more than a voluntary undertaking on his part, and was in no way binding upon the company, since it was under no legal duty to render such assistance as he had been asked to give her. We are not prepared to say that this position was well taken, considering the contention of the defendant as an abstract proposition of law. It is undoubtedly true that a mere gratuitous promise on the part of a railway conductor to do a passenger a service which the carrier is under no legal or contract duty to perform is not binding upon the carrier. *Nunn* v. *Georgia Railroad*, 71 *Ga.* 710; *Central Railroad* v. *Whitehead*, 74 *Ga.* 442, 449. And it follows, of course, that as a carrier is not, ordinarily, under any duty to render assistance to passengers in alighting from its cars (*Daniels* v. *Railroad Co.*, 96 *Ga.* 786), it can not be held accountable for a failure by its conductor to comply with a promise to give such assistance to a passenger not entitled to claim it as a matter of right, or to a passenger who, though he may need assistance in alighting at his destination, fails to so inform the conductor, when he has no notice of that fact. *Western & Atlantic R. Co.* v. *Earwood*, 104 *Ga.* 127; *Southern R. Co.* v. *Reeves*, 116 *Ga.* 743. There is, however, much respectable authority for the proposition that when a "passenger is manifestly aged, infirm, sick, or of defective eyesight, then it becomes the duty of the railway carrier to render to him or to her such assistance," provided, of course, that the "servants of the carrier know, or by reasonable attention to their duties ought to discover, the fact of

such infirmity." See 3 Thomp. Negl. § 2846, and cases cited; also, Hutch. Car. (2d ed.) §§ 617a, 670; 2 Shear. & Redf. Neg. (5th ed.) § 510; Ray, Neg. Pas. Car. § 67; 1 Fetter, Car. Pas. § 106 et seq. We are inclined to the view that such is the law. But be this as it may, it is certainly true that the plaintiff's petition was not open to demurrer because she therein alleged the making and non-fulfillment of promises by the conductor to render her assistance in alighting from the train when she reached her destination. The gist of her grievance against the company, as set forth in her petition, was that she was not given notice of the approach of the train to the station, or afforded a reasonable time and opportunity to alight, but was carried beyond the station a quarter of a mile, and then forced to leave the train at a lonely place, in the nighttime, with no choice save to travel on foot through the rain back to the station. The account given concerning what occurred between the plaintiff and the conductor prior to the arrival of the train at Bremen merely served to emphasize her recital of the carrier's neglect of duty. " It is a well-settled principle of law that a railroad company carrying passengers, in order to afford them opportunity to leave the train at their places of destination, is bound to have the name of the different stations announced upon the arrival of the train, and then to stop the train for a sufficient length of time for passengers to get off with safety." 5 Am. & Eng. Enc. Law (2d ed.), 565. To the same effect, see also Ray, Neg. Pas. Car. 138; Hutch. Car. (2d ed.) § 614.

That Mrs. Hobbs informed the conductor of her intention to leave the train at Bremen, and that he assured her " he would take care of her and requested that petitioner be not alarmed," were relevant and material circumstances to be alleged, as showing she had exercised all the diligence to be reasonably expected of her in the matter, and that the conductor had full and ample notice of her desire to leave the train at a designated station. That she further informed the conductor she was partially blind and was traveling unattended was likewise relevant, since " if any passenger needs an unusual time to get off, by reason of physical infirmity, he must notify the conductor of the fact." 2 Sher. & Redf. Neg. (5th ed.), § 508, p. 924. That the conductor promised Mrs. Hobbs to " see her off the train all right" was another fact germane to her case as laid; and it was proper to allege this promise, if given, as indicating that the conductor understood what she told him concerning

her infirmity and recognized that, as to one thus afflicted, he was bound to observe the reasonable requirement of the law that when a particular passenger, because of sickness or physical infirmity, is "unable to leave the car with the usual celerity," and so notifies the conductor, "then he should furnish due opportunity" to alight in safety. Bish. Non-Cont. Law, § 1100. See also 5 Am. & Eng. Enc. Law (2d ed.), 577–578. To carry the plaintiff beyond her destination was, in view of the allegations set forth in her petition, inexcusable negligence. To stop the train at a lonely place far beyond the station and there call upon her to alight amounted to a technical expulsion, even though she may have made no protest ; and, on the assumption that all she alleged was true, she was entitled to compensation for the annoyance and inconvenience of being carried past her station and of being compelled to return thereto on foot, as well as for pain and suffering from illness thus brought about, loss sustained by reason of inability to work, etc. *Southern R. Co.* v. *Humphries*, 108 *Ga.* 594. What has been said above disposes of all questions raised by the defendant company's demurrer.

In its motion for a new trial, exception was taken to certain instructions which the court gave the jury touching the failure of the company's conductor to comply with the promise of assistance which she claimed he had made to her. These instructions were not nicely adjusted to the pleadings or the evidence; for they were based on the theory that the company's liability depended exclusively upon whether or not such a promise was given and ignored by the conductor. Counsel for the railway company requested the court to charge the jury as follows: "If you believe that the promise of the conductor was, as alleged, to help the plaintiff 'alight,' and that the conductor was at the proper and usual place to help the plaintiff alight when the train arrived at Bremen, then his failure to go into the car and get plaintiff would not make the defendant company liable." We think this request should not have been, as it was, refused. Mrs. Hobbs testified, as a witness in her own behalf, that when the train stopped at the Bremen station she kept her seat and waited "just a moment" for the conductor to come and assist her, and that she then "got up and started to the door to see if [she] could see any light at the depot," but before she "got to the door, the train started;" that the train stopped "just a few

moments"—not longer than "two or three minutes;" that she
"started before the train started;" that the conductor "had had
time to help the other passengers off and get back where" she was,
she supposed, before the train started, and would have come to
help her off if "he had done like all the rest had" (referring to other
conductors who had assisted her on a journey she had taken from
Texas to the city of Birmingham, where she boarded the defend-
ant's train); that she "didn't make any effort to get off the car
when they stopped at Bremen," but waited for the conductor to
come to her in the car, and that "the train started before he came
in." Evidently the plaintiff, in thus making no effort to leave the
train, acted under the impression that the conductor would, after
helping all other passengers to alight from the steps of the car to
the station platform, come to where she was sitting in the car, bur-
den himself with her bundles, escort her down the aisle and out
upon the platform of the car, and then assist her down the steps
and onto the station platform. There was introduced in evidence
no special contract between her and the company whereby it un-
dertook to bestow upon her any such extraordinary attention. On
the contrary, we gather from the record before us that she was the
holder of a ticket such as is customarily sold to a mere ordinary
member of the traveling public. The question therefore is: did
the company, by selling her such a ticket, enter into a contractual
obligation to render to her the special service she expected of the
conductor?

A contract of carriage on the part of a carrier of passengers dif-
fers essentially, as a general rule, from that of a carrier of goods,
since the latter assumes the duty not only of transporting to des-
tination but of unloading its cars as well. So it is universally held
that, as to passengers able to help themselves in entering and leav-
ing a train, a railway company is under no duty either to load or
unload them, provided it furnishes suitable means for safely board-
ing and alighting from its cars. There was, in the present case,
no pretense on the part of the plaintiff that she was unable to leave
her seat in the car and walk without assistance down the aisle and
out upon the platform, carrying her bundles with her, and there
presenting herself and them to the conductor. She was but eight-
een years of age at the time, and her only physical infirmity, so
far as was shown at the trial, was partial blindness, she being near-

sighted and her eyes being weak.     Certainly the defendant company was under no duty to furnish her assistance which she did not need because of her infirmity, and the conductor was without power to bind the company by any promise he may have made to render assistance which she did not require.     Moreover, the only promise she claims he made to her was to assist her "off the train," which he stated "it was his duty to do."     As was held in the case of *W. & A. R. Co.* v. *Earwood*, 104 *Ga.* 130 (wherein it appeared that a conductor made a like promise to give assistance to a female passenger), such an undertaking does not amount to "a promise by the conductor to leave his other business and go into the car to assist [a] passenger from her seat to the platform and down the steps," but merely to a promise to assist the passenger, after she has reached the platform of the car, in alighting therefrom to the ground.     In pronouncing the judgment of the court in that case, the writer took occasion to remark:     The lady "construed the promise of the conductor to mean that when the train arrived at her destination he would leave his other business, come into the car, and assist her from her seat to the platform and down the steps.     The promise made, even if it had been binding, did not go to this extent.     It would greatly delay the business of the company if it could be held on such a promise that it was the duty of the conductor to go to the seats of all the ladies who had made similar requests and assist them, one by one, to the platform of the car and down safely to the ground."     The evidence in the present case shows almost conclusively, we think, that Mrs. Hobbs was afforded ample time to have left her seat and gotten to the platform of the car before the train started; and that the real cause of her being carried beyond the station was her reliance upon the wholly unwarranted assumption that the conductor had promised to pay her the especial and gratifying attention she had received from other conductors while en route from Texas to Birmingham.

It appears that the trial judge permitted the plaintiff to prove that it was "a custom on the road for conductors to lend especial assistance to" female passengers, when traveling unattended.     Counsel for the company made timely objection to the admission of evidence along this line, because there "was no allegation in the petition that would authorize any such evidence to go to the jury," and on the further ground that it was irrelevant and immaterial.

Obviously the evidence should, for the reasons given, have been excluded. That its admission was harmful to the defendant is equally clear, since the conductor, who testified by way of interrogatories, flatly contradicted the statement of the plaintiff that he had been informed of her infirmity and had promised to assist her in alighting from the train. In view of the proof offered concerning the custom referred to, the jury may have reached the conclusion that, irrespective of the question whether or not the conductor made such a promise, he was bound to observe this custom and give to the plaintiff the special consideration usually bestowed upon all ladies traveling without escort. Furthermore, even if such a custom really existed, it should, in the absence of proof that the company's governing officials had knowledge thereof and recognized it as entering into the contracts of carriage made with purchasers of tickets, be treated as amounting to no more than a practice on the part of obliging and chivalrous conductors to render to ladies courteous attention which they were not, in their capacity as ordinary members of the traveling public, entitled to demand as matter of right, and which the conductors were under no duty, relatively to either the carrier or to female passengers, to bestow.

2. It is, as we have above stated, the duty of a carrier of passenges to make to them timely announcement of the approach of its trains to regular stopping-places. There was, in the present case, a conflict of evidence as to whether such an announcement was made in the car in which the plaintiff was riding immediately before the train arrived at Bremen; and the court charged the jury, in effect, that if the conductor failed to notify her in some way that she had arrived at her station, and because of his omission to do so she was carried beyond her destination and she "suffered injury thereby, she could recover." This charge should not have been given; for the plaintiff, during the course of her testimony as a witness and while undergoing a searching cross-examination, unequivocally, though with unbecoming reluctance, admitted she knew, when the train next stopped after leaving Waco, that she had reached her destination. Accordingly, the alleged omission on the part of the company to announce in her hearing the approach of the train to the Bremen station could in no way have misled her. As already observed, the true cause of her being carried beyond that station seems to have been her failure to make any effort to leave

the train. Had she duly made her way to the platform of the car all would doubtless have been well; as the record before us discloses that the conductor assisted other passengers to alight from the steps to the station platform, and was in a position to likewise assist her.   Upon the assumption that he did make to her the promise of assistance alleged, but overlooked the same when her destination was reached, still if she had presented herself to him on the platform of the car, instead of relying upon the mistaken belief that he would come into the car after her and her bundles, his promise might have been recalled to him, or he might as a matter of course have helped her, as he had the other passengers, to alight.

3. Exception was also taken to the following charge of the court:   " In every tort there may be aggravating circumstances, either in the act or the intention, and in that event the jury may give additional damages."   It is a matter of grave doubt whether the plaintiff was entitled to recover anything at all; but be this as it may, no charge on the subject of aggravating circumstances should have been given.   There was no pretense on her part that the conductor treated her harshly or discourteously, or with anything save polite consideration, when he discovered that she had been carried past the station and sought to make amends by promptly stopping the train and affording her an opportunity to get off.   As to this phase of the case, it is controlled by the decision of this court in *Southern R. Co.* v. *Humphries*, 108 *Ga.* 594, a similar case upon its facts, wherein it was held that mere negligent omission of duty on the part of a railway conductor does not call for punitive damages.

*Judgment reversed.   By four Justices.   Lumpkin, P. J., absent. Candler, J., disqualified.*