*Twiggs & Gazan,* contra.

---

## CENTRAL OF GEORGIA RAILWAY CO. *v.* MADDEN.

1. As a general rule, it is not the duty of the employees of a railway company in charge of a passenger-train to physically assist passengers in alighting therefrom, but to furnish reasonable opportunity and facilities for leaving the train; but the duty of rendering assistance may arise from special circumstances.

2. Ordinarily where a passenger obtains a ticket entitling him to transportation over a railway between two designated points, no duty exists on the part of the carrier to afford him opportunities to leave the train before reaching his destination, or to assist him in so doing.

3. If a passenger on a railway train becomes ill in transit, and this is known to the servants of the carrier in charge of such train, or is so apparent that they are charged with knowledge of it, it is their duty

to give him such care and protection beyond that demanded under ordinary circumstances as is reasonably practicable with the facilities at hand, and consistent with the safe and proper conduct of the business and the safety and comfort of the other passengers.

4. If a duty of protecting a passenger on board of a railway train arises, either in the ordinary course of business or under special circumstances, the measure of diligence required to be exercised by the carrier is extraordinary care.

5. Where a female plaintiff contended, and introduced evidence tending to prove, that she became ill while on board a passenger-train, and that the carrier was negligent in failing, on request, to afford her an opportunity to leave the train in order to procure assistance and medical attention, and in failing to assist her in leaving it after knowledge of her condition, but that she succeeded in getting off, though suffering extreme pain and about to be delivered of a child, it was not error to refuse to charge that if the jury believed she was able to leave the train without the assistance of the conductor, she would not be entitled to recover.

6. It was error to charge that "for pains incident to childbirth, if no more, if not unusual pain, you should find for defendant," inasmuch as if there were unusual pain it might not have resulted from negligence of the defendant.

7. It is not good practice to omit entirely to give the jury any instruction on the subject of the measure of damages, or the diminution of damages which may result from negligence on the part of the person injured, even in the absence of requests therefor.

8. Ordinarily the supposition of a witness is not admissible in evidence. But where the nature of the case was such that the question of the knowledge of the conductor of a railway train of the physical condition of a passenger, and whether he failed in his duty toward a sick passenger, were involved as affecting the question of liability of the railroad company and the extent of the recovery, if any, it was admissible for him to testify that the passenger complained of being sick, but did not state the nature of such sickness, and that he "supposed it was train sickness."

9. There were some other inaccuracies of expression in charges complained of, but they will probably not occur on another trial and need not be specifically considered. The newly discovered evidence, if competent, can be offered on another trial.

SEPTEMBER 30, 1910.

Action for damages. Before Judge Reagan. Monroe superior court. June 28, 1909.

The substance, now material, of the petition as amended, in an action brought by Mary Madden against the Central of Georgia Railway Company, was as follows: The plaintiff boarded the defendant's passenger-train in Atlanta at about eight o'clock a. m., bound for Wrightsville, Georgia, having purchased a ticket for the journey from defendant and having had her trunk checked

from the former to the latter place. The train was due in Macon at about 11.30 a. m. She was far gone in pregnancy at the time, and expected to be confined in about two weeks. Her condition must have been apparent to the conductor of the train, had he exercised the slightest care in observing her. She was accompanied only by her little son, who was too young to render her any assistance. The motion of the train brought on, prematurely, the pains of childbirth. When she realized that the pains of labor were upon her, she notified the conductor of the fact and requested him to put her and her trunk, which contained her own clothes and those she had prepared for the child to be born, off at the next station, where she could receive the care and treatment proper for one in her condition. This request was first made of the conductor when the train was about twenty or twenty-five miles from Atlanta. He refused to comply with her request, and informed her that she must go on to Macon. Her pains became more frequent and severe as the train continued on its way, and realizing that the child was about to be born on the train, despite her efforts to repress her labors and to defer the event, she appealed to the conductor repeatedly, and as often as he passed through the car, to put her and her trunk off at each next station, and to assist her in getting off. She was unable, on account of the great pain that she was suffering, to alight from the train without assistance, and so informed the conductor whenever she made such requests of him. He continued to refuse to put her and her trunk off, saying that she must go to Macon. Her condition became obvious to the other passengers and she endeavored to hide herself in the toilet for ladies in the coach. When the train reached Bolingbroke her pain had become so extreme and the birth of the child so imminent that, in her desperation,—hardly knowing what she was doing, she alighted from the train with intense pain and anxiety, rushed into the station-house of the defendant, and requested the young and unmarried man in charge thereof to procure her a doctor at once, as she was about to be delivered of a child. In a very few minutes, and before a doctor came, the child was born in the station-house, without any assistance to relieve her and to alleviate her pain, and where there was no bed or couch upon which she could lie, and without any of the conveniences necessary at such times. On the defendant's road, between Jonesboro (about eigh-

teen or twenty miles from Atlanta) and Bolingbroke there are seven or eight stations where the train stopped, "and several towns of large size, to wit: Griffin, where there is a hospital, Barnesville and Forsyth, where she could have alighted from the train if assisted, and where her trunk could have been put off, and she could have readily obtained medical assistance, and other assistance needed by women in her condition; . . but at neither of these stations or towns would the conductor assist her from the train or put off her trunk." She "suffered while on said train, not only the pains incident to childbirth, but these pains were aggravated by her surroundings, and by the fact that she was on a train which was constantly in motion. She endured extreme anxiety and nervousness incident to the conduct of the conductor in refusing to put her off with her baggage, and in refusing to procure her medical assistance. Her delivery was rendered far more painful on account of such conduct, and she was compelled to be delivered of her child in the station-house at Bolingbroke on account of the conduct of the conductor." The negligence charged was, (1) the failure of the conductor to recognize the plaintiff's condition and to realize that she could not be carried to Macon, especially after he was informed by her that she was already in labor; (2) his refusal to comply with her request to put her and her trunk off and to assist her in getting off the train; (3) his failure to procure for her "a physician, if there was one on the train, or telegraphing for one, or in not asking for one at some of the various stations which the train passed;" and (4) the failure of the conductor to assist her in alighting from the train at Bolingbroke and to put off her trunk at that station. Damages were claimed for the pain and suffering, both physical and mental, which she endured by reason of the negligence of the defendant's agents and employees.

The petition was demurred to, and the demurrer overruled. The trial resulted, upon sharply conflicting evidence, in a verdict for the plaintiff. The case came up on a bill of exceptions sued out by the railway company, assigning error upon the overruling of its demurrer, and upon the refusal to grant a new trial.

*Hall & Cleveland, Cabaniss & Willingham,* and *J. E. Hall,* for plaintiff in error. *R. L. Berner* and *J. M. Fletcher,* contra.

FISH, C. J. (After stating the foregoing facts.)

1. The demurrer began with the following language: "And now comes the defendant in the above-stated case and demurs to the plaintiff's petition and moves the court to dismiss the same, for the following reasons." Then followed a series of reasons, each beginning with the word "Because." We construe this demurrer to be general in its character and as declaring that the whole petition should be dismissed for certain assigned reasons, and not that certain parts of the petition were insufficient, or that certain allegations were specially demurred to and sought to be stricken therefrom. The exception is to the overruling of the demurrer as a whole, and the refusal to dismiss the entire petition, not to the refusal to strike any particular part of it. We will, therefore, only deal with the question whether the petition as a whole, together with the amendment thereto, set out a cause of action. Thus considered, we think the demurrer was properly overruled. It does not follow, however, that because we hold that the petition, as a whole, should not be dismissed for certain reasons, this adjudicates that each of the allegations sets out a cause of action or a valid right on which to base a recovery.

A carrier of passengers is bound to use extraordinary diligence to protect the lives and persons of its passengers. Civil Code, § 2266. What extraordinary care requires depends upon circumstances. One circumstance for consideration in dealing with a passenger is the condition of such passenger, known to the carrier or its agents, or so apparent as to charge them with knowledge. To illustrate: what would be a reasonable time to allow a passenger in vigorous health, and in full possession of his faculties, to alight from a car might not be reasonable for a lame or blind passenger, or one disabled by disease. If the carrier or its agents know of the infirm or disabled condition of a passenger, this is a circumstance to be considered in determining what extraordinary care requires in this regard. As to persons who are not passengers, as, for instance, a person who is seen to be crossing a railroad track by the servants of the railroad company engaged in running its approaching train, the condition of such person as to age, feebleness, deafness, or other disabling cause, if known or apparent to them, would be for the consideration of the jury in determining what ordinary care required on the part of

14

such agents of the railroad company, where the measure of diligence required was ordinary care. There is a difference between common carriers of goods and carriers of passengers. The former undertakes to carry and deliver; the latter ordinarily undertakes to carry and afford reasonable opportunity and facilities for entering upon the carriage and leaving it at the point of destination. It is not one of the ordinary undertakings of a carrier of passengers to furnish nurses or medical attention. This idea has been expressed by saying that the carrier does not conduct a hospital. If one who is sick, with knowledge of the fact, gets aboard a train, he can not complain that he suffers pain because of such sickness, or that the ordinary and necessary motion of the train increases his pain, without negligence on the part of the carrier; nor that he lacks medical attention or nursing, with which he has not provided himself and which the carrier has not agreed to provide for him. Nevertheless, a carrier of passengers does not deal with the strong and well and the vigorous alone; and a condition may arise by reason of the sickness of a passenger upon its train which will create an emergency imposing upon the carrier the duty of dealing with the passenger in accordance with the situation thus arising. General statements of rules are sometimes subject to modification under peculiar emergencies or situations. Thus, it may be, and often is, stated in general terms that a passenger who pays his fare is entitled to be carried to his destination and there afforded reasonable opportunity to leave the train. But if it should be ascertained that a passenger was suffering with smallpox, the carrier not only might cause him to leave the train before arriving at the destination pointed out in his ticket, but, under its duty for the protection of its other passengers, it might become necessary to compel him to do so. So, also, if a passenger should have a ticket for a journey of a thousand miles, and after he has been carried one hundred miles it should be ascertained by the conductor of the train that such passenger is in a dying condition, it could hardly be successfully urged that the agents of the carrier could wholly ignore this situation and allow the man to die, without the opportunity for obtaining assistance or attention, merely because he had not reached the destination pointed out in his ticket. It will thus be seen that circumstances and emergencies may raise a duty on the part of the

carrier to afford a passenger a reasonable opportunity to leave the train and to obtain assistance before reaching the destination originally intended. If the passenger traveled to the end of his journey, the duty of exercising extraordinary care for the safety and protection of his person, in connection with his discharge as a passenger, would rest upon the carrier. If the circumstances were such as to raise the duty on the part of the carrier to discharge him from the carriage before reaching the destination indicated by his ticket, it is not easy to see why extraordinary care should not also be required of the carrier in discharging him at such intermediate point. Under ordinary circumstances it has been sometimes declared that there was no general duty on the part of the carrier to assist passengers in alighting from a train, but it has never been held in this State, where the point was directly involved, that under no circumstances does extraordinary care require the lending of assistance to persons who are disabled by sickness and without attendants, and so known to be by the agents of the carrier.

In *Atlanta Consolidated Street Railway Co.* v. *Hardage*, 93 *Ga.* 457 (21 S. E. 100), Bleckley, C. J., in discussing a case where a woman and child, who were sick, boarded a street-car and were ejected therefrom, said: "If it was a fact that she and her child were sick and the conductor knew it, why should this not go before the jury? If they were sick people, they were entitled to be treated as such, the conductor knowing of their condition." It is true that this was said in dealing with a case of ejection, but it treated the sickness of the passenger, known to the conductor, as a circumstance to be considered by the jury in determining what was the proper method of dealing with her and treating her. In *Southern Railway Co.* v. *Reeves*, 116 *Ga.* 743 (42 S. E. 1015), it was said: "Ordinarily it is no part of the duty of the employees of a railway company in charge of a passenger-train to assist passengers to alight therefrom; but this duty on their part may arise when the circumstances are such as to suggest to them the necessity of assistance. Whether in a given case the circumstances were such as to suggest the necessity of assisting a passenger to alight is a question to be determined by the jury." See also *Southern Railway Co.* v. *Hobbs*, 118 *Ga.* 227, 230-231 (45 S. E. 23, 63

L. R. A. 68), and authorities there cited; 1 Fetter on Carriers of Passengers, § 106 et seq.

In the present case, if the plaintiff, knowing of her condition, entered upon the train and suffered pain, which was produced or increased by the ordinary and usual motion of the train, this would not furnish her any cause of action. If the company was liable, it must have been because of some breach of duty on its part or that of its agents toward her. If she became worse, so that her confinement was imminent, and she so informed the conductor and requested that she be allowed to leave the train at some station before arriving at her contemplated point of destination, in order that she might obtain assistance and be properly treated, the conductor, with knowledge of her condition, could not disregard such request merely because her ticket entitled her to be carried to a station farther on. In view of this situation, he would be bound to use extraordinary care, and if such care required that she be allowed to leave at some intervening station, or that she be assisted in so doing, in view of her condition, and there was a failure of duty in that regard, the company would be liable to the extent of the damages resulting therefrom. The rule is thus stated in 2 Hutchinson on Carriers, § 992: "The carrier, it has been said, is under no duty to turn his vehicles into hospitals, or his employees into nurses. But if an unattended person who is so sick, aged, or otherwise infirm as to be unable to assist or care for himself, be accepted as a passenger, the carrier, if he has notice of the passenger's condition, is bound to exercise for his safety a degree of care commensurate with the responsibility assumed, and that would be such care as would be reasonably necessary to protect him from injury in view of his physical or mental condition. And if the passenger should be so unfortunate as to become sick while upon the journey, and in consequence less able to look after himself, he would not thereby be put beyond the pale of care and protection, and it would be the duty of the carrier, if the passenger's condition were made known to him, to give him such care and protection beyond that demanded under ordinary circumstances as would be reasonably practicable, with the facilities at hand, without unduly delaying the train or unreasonably interfering with the safety and comfort of the other passengers." See also, Atchison, T. & S. F. Ry. Co. *v.* Weber, 33 Kan. 543 (6 Pac. 877, 52 Am. Rep.

543) ; Lake Shore & Mich. So. R. Co. *v.* Salzman, 52 Ohio St. 558 (40 N. E. 891, 31 L. R. A. 261) ; Sheridan *v.* Brooklyn & N. R. Co., 36 N. Y. 39 (93 Am. Dec. 490) ; Pittsburg & C. R. Co. *v.* McClurg, 56 Pa. St. 294; Gulf & S. F. Ry. Co. *v.* Coopwood, (Tex. Civ. App.) 6 S. W. 102.

There was no error in refusing, on written request, to charge the jury that if they believed from the evidence that the plaintiff "was able to leave the train without the assistance of the conductor, she would not be entitled to recover." This made the case turn upon the question of absolute ability on the part of the plaintiff to leave the train without assistance, and would have practically amounted to an instruction to find for the defendant, inasmuch as both the petition and the plaintiff's own testimony showed that she did leave the train without the assistance of the conductor or other agent of the company; although she testified, ".The reason I got off, I was desperate, and didn't know hardly what to do. I didn't think I would live, and didn't think I could get off until I got there. I was about half crazy and in desperation. I didn't want the child to be born among the passengers, and so I leaped off. Nobody helped me off."

The court charged as follows: "In other words, the defendant would not in any event be responsible for such pain as she would have necessarily suffered on account of the birth of a child. For pains incident to childbirth, if no more, if not unusual pain, you should find for defendant." This charge was erroneous. According to the plaintiff's own statement, her delivery was premature. She contended that this was caused by the motion of the train, but there was neither allegation nor proof that there was any unusual or negligent motion. Thus, there may have been a premature birth without negligence on the part of the defendant. If so, it is altogether possible that such a delivery may have caused unusual pain, without creating any liability on the part of the defendant. Besides, the expression "unusual pain" did not clearly indicate whether the comparison was to be made between this delivery and former deliveries by the same woman—her testimony showing that she had previously given birth to other children—or whether the comparison was to be with what was usual with other women. The mere fact that a woman under such circumstances may have suffered more than usual pain would not prevent a find-

ing for the defendant. If there could be a recovery, it must be for that which resulted from a want of due care on the part of the carrier or its agents.

The court nowhere gave to the jury any instruction as to the measure of damages, except from such intimations as might be gathered in charges like that just dealt with. Where there is no exact pecuniary measure, but the extent of a recovery, if any, must be left to the enlightened consciences of impartial jurors, no very elaborate instructions are required; but it would certainly have been better practice for the court to have given the jury some instruction on the subject. Neither did the court instruct the jury as to the law of comparative negligence and the diminution of damages if both parties were at fault and if the plaintiff's fault was not such as to prevent a recovery by her. Whether or not these things alone would necessitate a new trial, in the absence of a request to charge, the omissions emphasize the harm which may have been done to the defendant by the inaccurate expressions in certain charges which were given.

The conductor testified: "She [plaintiff] said she wanted to get off at the next station, as she was sick. I did not ask her the nature of her sickness, but supposed it was train sickness." Upon objection, the court ruled out the words, "but supposed it was train sickness." The supposition of the witness would furnish no evidence of the existence of the fact supposed. But in this case, where knowledge on the part of the conductor as to the condition of the plaintiff was involved as affecting the question of liability and the extent of the damages recoverable, and where the plaintiff sought to prove that he had knowledge of her actual condition, such evidence was admissible in behalf of the defendant.

There were some other inaccurate expressions in the charge, besides those dealt with above. Thus, the presiding judge submitted to the jury the question whether the plaintiff, while a passenger, was injured "by the acts of the defendant company." At another time he charged that if the plaintiff by the exercise of ordinary care and diligence on her part "could have avoided the injury sustained." Again, in stating the duty of the defendant company, he used the expression, which was probably rather broad, "in preventing any injury to her." Still again, he instructed the jury that "for any humiliation or indignities"

which plaintiff may have suffered by reason of the act of the defendant, if negligent, she could recover, there being no evidence of any indignities. Whether or not these verbal inaccuracies amounted to errors, in the light of the entire charge and the evidence, need not be discussed, as they will probably not occur again. So likewise, as a new trial is granted on other grounds, the newly discovered evidence will be available, if. competent, on another hearing. No specific ruling as to the trunk of plaintiff was assigned as error, and we make none.    *Judgment reversed. All the Justices concur.*